# ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP

Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

Franklin A. Rothman                                    Fax: (212) 571 5507
Jeremy Schneider                                       Tel: (212) 571 5500
Robert A. Soloway
David Stern
────────────
Rachel Perillo

March 15, 2022

By ECF

Hon. Valerie E. Caproni
United States District Court Judge
40 Foley Square
New York, New York 10007

> Re:  United States v. Avila, et al. (Tyler Patterson)
> Ind. #: (S3) 19 Cr. 166 (VEC)

Dear Judge Caproni:

I represent Tyler Patterson in the above-referenced matter, who is pending sentence before your Honor following his guilty plea to Racketeering Conspiracy.  He is now 24 years old, and has no prior criminal record.  At the time of his arrest in August 2020, he was 23, and when he committed the June 2018 shooting for which he has accepted responsibility, he had not yet attained the age of 21.  None of these observations alter the severity of the crimes for which he is responsible, but they are relevant to sentencing, as are many other factors, including his very challenged upbringing, unduly harsh conditions of pre-trial confinement, and  the goal of avoiding unwarranted sentencing disparities among similarly situated offenders.

This letter is submitted in support of Mr. Patterson's  request for a sentence of no more than 132 months imprisonment -- a downward variance of 19 months from the bottom of 151-188 month Guidelines' range -- but an extremely substantial imprisonment term for a young man with no prior criminal record and no time spent in prison.  It is the sentence recommended to this Court by United States Probation. (PSR at p. 23).  And with whatever term is imposed, the Court may add a period of supervised release which will assist Mr. Patterson upon release to overcome substance abuse issues, and his lack of both vocational training and work experience.

Annexed hereto as Exhibit A is a letter in support of Mr. Patterson from his sister, Shamara Bell.

### A.  Comparison with Co-Defendant Sentences Supports a Downward Variance in this Matter.

The government begins its sentencing letter of November 23, 2021 (hereinafter the "Gov't

Sent Ltr") asserting that Mr. Patterson merits a sentence at the top of the stipulated sentencing Guidelines range of 151 to 188 months imprisonment, a sentence which would be just four months shy of the most severe sentence this Court has imposed to date in this case. That 192 month sentence was received by Jalen Colds based on a sentencing Guidelines range of 198 to 217 months, a range this Court noted at sentence, which could have been dramatically higher because one of the several shootings Colds committed, "could quite easily have been characterized as a first degree attempted murder," but was not for purposes of fixing the base offense level. (*See*, Colds' Sent Minutes, Doc. 244, at pp. 5, 8) .

The government arrives at its position by characterizing the defendant's crimes as "heinous" and driven by a thirst for ever more "carnage":

> Over the past few years ... Tyler Patterson has engaged in heinous acts of violence. In June 2018, he shot and paralyzed Malik Wilson. He shot Malik so that his gang ... could brag about being up on some cruel and senseless 'scoreboard' that tracked injured and murdered gang members. The defendant was not bothered that he had destroyed the lives of a young man and his family. Just a few months later he served as a lookout while another member of his gang fired shots at rival gang members ... hitting one individual in the leg. Still unsatisfied with his record of carnage to that point ... [he] along with several members of the Jack Boyz, violently punched, kicked and beat an individual outside of a hotel, causing the individual to need stitches.

Govt Sent Ltr at p.1.

But these assertions are not accurate. Most notably, the defendant did not go "without bother" a few months *after* the shooting of Malik Wilson to serve as a lookout at another gang shooting because the only other shooting at which he was present occurred October 7, 2017, eight months *before* Malik Wilson was shot.

Indeed Mr. Patterson's crimes -- together with the many other senselessly vicious and destructive attacks committed on both sides of the object rivalry -- are reprehensible. But federal sentencing is not occupied exclusively with offense conduct, and many other considerations are centrally relevant to fashioning a just and appropriate sentence for my client. To name another consideration relevant here, the Court has a statutory duty "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See*, 18 U.S.C. § 3553(a)(6).

Such comparison here reveals that all co-defendants sentenced to date -- Patrick Avila, Leon Smalls, Nazae Blanche, Jalen Colds, Isaiah Moss, Corey Cray, and Devonaire Price -- with the exception only of Mr. Colds, received imprisonment terms lower than the government seeks here, and many (though not all of them) were personally involved in criminal activity at least or more serious than that of my client. Five of the seven received the benefit of a variance below their

applicable sentencing Guidelines ranges.[1]

Relating some details will illustrate the point. Jalen Colds gang activity included personal participation in three shootings at which individuals were shot, as well as the May 2019 hotel assault and robbery committed by several members, including my client. He had a prior criminal history of attempted forcible rape, gunpoint robbery, and forcible touching. On October 7, 2018, during a search for gang rivals, Colds "ran with his arm outstretched and discharged his firearm in the direction of the rivals and the group behind them ... [hitting] one of the bystanders in the neck." (*See*, Govt Sent Ltr of 9/25/2020, Doc 215, at p.2). He was sentenced with his history of varied and serious violent crimes stretching over five years to principally 192 months imprisonment, this Court noting "[t]he lack of empathy is a problem because it means you don't think through what the other person is going to feel when you hurt them. In this case I see a young man with very little respect for the law or for the society that exists around him." (Colds' Sent Minutes, Doc. 244, at p. 22) .

Nazae Blanche, a participant in no less than five gang shooting attacks on rivals -- and a shooter on May 28, 2017 when he shot his victim in the neck -- received 168 months imprisonment for using a firearm in furtherance of a violent crime. (PSR at ¶ 13) In its sentencing submission, the government asserted Blanche "participated in [five] attempted murders with other members of the Jack Boyz ... within two years." (*See*, Govt Sent Ltr of 9/19/2020, Doc 219, p.2). Per government proffers, and in contrast to Mr. Patterson, he was also a gang leader. ("[L]ooking at the more complete picture of who Mr. Blanche is in terms of the Jack Boyz ... he is actually a vocal leader of the Jack Boyz." (Blanche Sent Minutes, Doc. 233, p. 9).

Patrick Avila and Leon Smalls both faced career offender advisory Guidelines ranges of 267-327 months, and both received downward variances -- Avila to 144 months imprisonment, Smalls to 180. (PSR ¶¶ 10-11) Both participated as shooters in the October 30, 2018 shooting which resulted in an off-duty police officer being shot. The government alleged Avila fired the first shots, and opined it was likely a Smalls' bullet that struck the off-duty officer. Avila had two prior robbery convictions, which elevated him to career offender status, Smalls a prior history of multiple prior violent offenses, including assaults, armed robberies, and physical attacks on a girlfriend necessitating hospital care. For Smalls, as a result of his gang-related and prior violent history, the government sought a sentence within Smalls' very high Guidelines range, and United States Probation, unlike in the instant case, did so as well. (Govt Sent Ltr of 3/12/2020, Doc 144, at p.3)

In sum then, without minimizing the indisputable seriousness of Mr. Patterson's crimes, including the severe permanent injuries his offense caused to another young man and his family, his conduct simply is not as severe, systematic or repeated as that of Mr. Blanche, for example, who participated in five street shootings over the course of a two year period; or the multiple shootings personally perpetrated by Mr. Colds, together with his prior violent history, including gunpoint robbery and attempted forcible rape.

---

[1] They are Leon Smalls, Patrick Avila, Jalen Colds, Corey Cray, and Devonaire Price.

In contrast, then, with others charged in Jack Boyz shootings, Mr. Patterson's crimes are confined to three discrete criminal acts. He acted as a lookout on October 7, 2017 when Jack Boyz members walked to rival territory looking to shoot them. (PSR ¶ 34) He went to ABG territory on June 19, 2018 and shot Malik Wilson causing paralysis and the victim's confinement to a wheelchair. (PSR ¶ 35) And with Patrick Avila, Nazae Blanche and Leon Smalls, he beat up and robbed a rapper outside a New York City hotel on March 9, 2019 causing the victim to require 30 stitches in his skull. (PSR ¶ 36) These acts are intolerable and caused great harm, but at the same time, they fail to show or suggest in his conduct overall the insatiable appetite for violence the government asserts he possesses in the opening paragraph of its submission, and at other points as well. This is especially true when placed alongside the repeated violent conduct of similarly situated co-defendants, who far more regularly are involved in extreme violence than is Mr. Patterson. It is true that the June 19, 2018 shooting of Malik Wilson wrought disaster for the victim and his family. But it is the case that others who shot on both sides of the rivalry did so to injure and not to scare, and any one of them at any time could have caused the level of catastrophic damage wrought by the bullets Mr. Patterson fired at Malik Wilson. In one instance, of course, Darren Scruggs lost his life to the absurdly senseless gunplay underlying this case. And in every shooting episode that occurred, the same outcome could have been realized; it could have, but it just was not. None of that excuses what Mr. Patterson did, nor is it intended to. But the fact remains that unlike every one of his co-defendants charged with shooting at rivals, his criminal acts are confined to three discrete acts, and no more. Case evidence and facts about him, despite the government's vehemence toward Mr. Patterson, does not show the committed participation in violence that is on display in the acts and attitudes of similarly situated co-defendants. A noteworthy paragraph in PSR sums up the point:

> Tyler Patterson, a/k/a "Ty," was a member of the Jack Boyz, but according to the Government, specific information pertaining to when he joined the gang is unknown. Patterson participated in a shooting of a rival gang member, served as a lookout for a shooting, and participated in the assault and robbery of another individual. *The Government is not aware of any other acts of violence in which Patterson directly participated.* [Emphasis added].

(PSR ¶ 45)

It is respectfully submitted that these significant facts should be taken into account and influence this Court's ultimate judgment. The government has asked that Mr. Patterson be sentenced to nearly the most severe sentence of anyone in the case who was involved in shooting. But application of the relevant sentencing factors do not support that outcome. The choice is obviously among which very severe sentence this Court decides to impose. And it is respectfully submitted that, on balance, Mr. Patterson does not deserve a sentence of 188 months despite how disastrously Malik Wilson has been affected by his actions, but merits instead a below Guidelines sentence as requested and recommended by United States Probation of no more than 132 months.

**B. At 20 Years of Age, Tyler Patterson was Shot in a Gang-Related Attack and Prior to That, was Raised in a Chaotic Household by an Overwhelmed Mother**

One day at a community playground in 2017, shots were fired and Mr. Patterson was hit by

bullets in both legs. He was lucky. The bullets both went "through and through" and caused no major injuries. He recalls being discharged from Lincoln Hospital after approximately three days and returning by taxi to his foster home.[2]

That was Tyler Patterson's world. His father died before he was born. (PSR ¶ 80). He grew up with a mother who did not work, and lacked any notion of how to raise and care for children, but she gave life to eleven of them. She was arrested on March 6, 2012 when she struck her son with a wooden baseball bat to stop a fight he was having with three of his older sisters. He was 14 years old. The scuffle erupted after Tyler took a waffle from the kitchen, which he learned (the hard way) had been the property of the oldest of them, then 21 year old Tabetha. He was not seriously hurt, but he was seriously outnumbered, and after absorbing a beating, he ran for refuge two blocks away to the home of another of his sisters, Shamara, at 595 Trinity Avenue, where she lived with her two young sons.



---

[2]

At the recent trial of Jose Caban before this Court, the ambush by the Mitchell's Houses group was recounted by government witness Donnell Jenkins who identified it as the point in time when Jack Boyz "problems" with ABG escalated from "just regular street brawls" to gang members on both sides searching each other out to shoot them. (Caban Trial Minutes at p. 70)



There is a long history of scholarship examining the risks associated with adolescents residing in group homes, where they are raised primarily among peers, and the adults responsible for them are "shift workers."  A full review of the work is clearly beyond the scope of this letter. One 2014 report, "Consensus Statement on Group Care for Children and Adolescents," published in the American Journal of Orthopsychiatry, is direct, brief, and authoritative.[4]

> Although children may be placed in group care because of serious behavioral problems, it is reasonable to ask whether group care itself leads to increased involvement with the juvenile and criminal justice systems.

---

[3]



[4]

The report describes itself in the following statement:

> In an effort to integrate child development research into child welfare policy and practice the Annie E. Casey Foundation and the Youth Law Center convened a group of internationally recognized researchers in child and adolescent development whose work focused on parent-child relationships, the child welfare system, or the impact of congregate or institutional care on child well-being to discuss the appropriate role of group care settings in the child protection settings.  This statement is a product of that discussion and the research on which it is based.

Dozier, Mary (2014).  Consensus Statement on Group Care for Children and Adolescents, *American Journal of Orthopsychiatry*, Vol 84, No 3, 219-225, at p. 219.   A copy of report is annexed as Exhibit F.

*Id*. at 221.

The Consensus Statement reports generally on how reducing behavior and interpersonal problems in children requires healthy attachments with parent figures, a feature entirely absent from Mr. Patterson's life, and a fact also addressed in his sister's letter to the Court:

> When you feel like your parent was more worry [sic] about being a friend or being with a man or being locked in her room you had to learn how to grow up fast. There was no real structure in the home it was kinda every man for themselves.

(Exhibit A, Letter of Shamara Bell, at unnumbered p. 1).

One brief quotation from the Consensus Statement captures most of what went wrong for Mr. Patterson, and the majority of the young offenders that the instant case involves:

> A relationship with a parent figure can reduce the adolescent's susceptibility to deviant peer influences. An adult who is committed and invested in the adolescent's well-being can provide resources and supports that are not available from peers. These supports include monitoring the adolescent's activities, providing structure and supervision, negotiating increased adolescent autonomy, encouraging engagement in school, and planning for the future. An adolescent's bond with a parent figure provides a context for the adolescent to develop competencies that prepare him or her to successfully transition into adult roles. The adolescent who fails to develop a bond with a committed care-giver is likely to rely on peers for guidance and protection and to engage in risky behaviors.

Consensus Report at 220.

Everything talked about in the quoted passage was consistently missing during Mr. Patterson's formative years. But he has an appreciation of the errors he has made that comes from spending 19 months behind bars, and he is committed to not repeating the behaviors that have caused him the loss of his freedom.

### C.  *Mr. Patterson's Essex County Jail Detention Has Been Abnormally Harsh*

Mr. Patterson has been detained through some of the most grueling confinement conditions ever encountered in the history of federal detention. Arrested in August, 2020, he has endured constant COVID-19 lockdowns, long periods without social visits, no email or phones on frequent occasions, absolutely no programs, and very limited recreation. The conditions border on the inhumane and detainees are constantly fearful for their safety and totally isolated without the ability to keep in normal touch with their lawyers or families.

Many Judges have responded to unusually harsh confinement conditions by applying

7

sentence variances below the applicable Guidelines range to inmates affected. Horrors endured by many detainees during this unprecedented time have produced sentence reductions based on the conditions. *See, e.g., United States v. Morgan,* 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) (cutting sentence to less than half of low end of stipulated guidelines based in part on conditions at MDC during pandemic, and condemning awful conditions at both MCC and MDC even prior to current crisis); *United States v. Casillas*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020) (reducing length of sentence in part based on conditions at MCC during COVID-19 crisis); *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) (same for defendant detained at MDC).

Former Chief Judge McMahon's recent comments at sentence in *United States v Tiffany Days*, 19 Cr. 619 (S.D.N.Y. 2021, have (justifiably) garnered much attention. In *Days*, Judge McMahon varied downward from a Guidelines range of 63-78 months to the statutory mandatory minimum of 60 months imprisonment.  More importantly, the Judge referred with palpable disgust to the deplorable conditions under which Ms. Days, and those similarly situated, have recently fared in local federal detention.  According to a transcript of the April 29, 2021 sentencing, the Court opined that there is "no excuse" for the conditions in the MDC and MCC, and that the "treatment of … prisoners, the inmates, in the last 14 months have been nothing short, in my opinion, of inhumane, cruel and harsh, and unreasonably unjust."  She called them "as disgusting [and] inhuman as anything I've heard about [in] any Colombian prison," and personally noted that "[t]he single thing in the five years that I was Chief Judge of this court that made me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC, especially at the MCC, and the MDC, two federal correctional facilities located in the City of New York that are run by morons." (*Days*, 19 Cr. 619, May 12, 2021, Sentence Minutes*, Doc 35, pp. 19-20).

Finally, for just one more example among many, in April, 2021, Hon. J. Paul Oetken varied downward dramatically with respect to an MCC inmate facing his fourth narcotics conviction, and a sentencing guidelines range of 78-97 months, to 24 months imprisonment based primarily upon unduly harsh conditions of confinement, stating:

> Now, the defendant has already served 24 months of detention and that really has been under conditions that have been extraordinarily harsh. Most of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming. And I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think having served 24 months is equivalent to having served three years ... [T]hat is significantly below the guidelines ... but I think that's a long period of time.

*United States v. Gonzalez*, 18 Cr. 669, April 22, 2021, Sentence Minutes, Doc 250, pp. 17-18.

Having been at the Essex County Jail rather than at MCC or MDC has not made things very much better for Mr. Patterson, especially lately.  He reports that his unit has been locked down completely for the past several months, meaning he is permitted out of his cell one-half hour per day

and the other 23½, he is locked in a tiny two man cell with absolutely nothing to do.  It is truly unthinkable, and is either a function of dangerousness within the facility or COVID-19 protocols, but the inmates are uninformed as to the reason.  Thus, Mr. Patterson during his detention has clearly endured terrible confinement conditions, which are far from the norm, and from acceptable in a civilized society.  It is respectfully requested this Honorable Court factor in the terrible conditions of confinement my client has endured during his detention to date in arriving at a just and reasonable sentence.

### D.  Standing Alone, Mr. Patterson's Youth is a Mitigating Factor Supporting a Downward Variance at Sentence.

Mr. Patterson's youth at the time of the offense is a mitigating factor that directly bears on his culpability and substantially factors into his capacity for rehabilitation.  The Supreme Court has repeatedly stated that a defendant's youth is a mitigating factor when determining sentence. *See*, *Graham v. Florida*, 130 S. Ct. 2011, 2027 (2010) (the age of the offender and the nature of the crime each bear on the analysis); *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (the obvious differences between youths and adults render suspect any conclusion that a juvenile falls among the worst offenders); *Johnson v. Texas*, 509 U.S. 350 (1993) (youth is a time and condition of life when a person may be most susceptible to influence and to psychological damage).  In *Johnson*, supra, the Supreme Court stated:

> The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult. Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character.  From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, [t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.

*Id*. (internal citations omitted).

This analysis is not altered by the fact that Mr. Patterson had just turned twenty at the time of the offenses, instead of still being eighteen or less.  As stated by the Supreme Court in *Roper*, "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper*, 543 U.S. at 574.  Psychology and brain imaging strongly support the view that nineteen year old males are still developing the brain functions that control impulsiveness and resistance to peer pressure, and that a nineteen year old is still an "adolescent" in terms of brain and psychosocial development.  See, for example, Brief for the American Psychological Association and the Missouri

Psychological Association as Amici Curiae Supporting Respondent at 9, *Roper v. Simmons*, 543 U.S. 551 (2005) (No. 03-633), 2004 WL 1636447 at *9 ("Roper, APA Brief"); Elizabeth S. Scott & Laurence Steinberg, *Rethinking Juvenile Justice* 236 (2008).

Numerous studies document the limitations on the ability of adolescents to control impulsiveness. See, Dr. Laurence Steinberg, "Adolescent Development and Juvenile Justice," 2009 *Ann. Rev. Clinical Psychol.* 47, 58 (2009) ("[I]ndividuals become more resistant to peer influence and oriented to the future, and less drawn to immediate rewards and impulsive, as they mature from adolescence to adulthood."); Laurence Steinberg, et al., "Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems Model," 44 Developmental Psych. 1764 (2008) (self-report and performance measures on tests show "a linear decline in impulsivity between the ages of 10 and 30"). Brain imagery technology demonstrates that critical regions of the brain responsible for controlling thoughts, emotions, impulsivity, and actions continue to develop through age 25. *See*, for example, Elizabeth R. Sowell et al., "Mapping Cortical Change Across The Human Life Span, 6 Nature Neurosci. 309 (2003); Nitin Gogtay, et al., Dynamic Mapping of Human Cortical Development During Childhood Through Early Adulthood," 101 Proc. of the Nat'l Acad. of Sci. 8174 (2003) (studying subjects aged 4-21); Steinberg, "You and Your Adolescent: The Essential Guide for Ages 10-25," 116 (Rev. ed. 2011) ("Imaging studies show that the brain is still maturing well into the mid-20s, especially in regions responsible for regulating emotions, controlling impulses and balancing risk and reward.").

Both Mr. Patterson's personal characteristics and the circumstances of the offense support considering his youth as a mitigating factor, and the offense of conviction the product (at least in some measure) of impulsivity and susceptibility to pressure of older individuals. As set forth in his sister's letter, Exhibit A, his father died before he was born and he was without male role models throughout his youth and adolescence, then in a group home for years during a critically important time in his development. Thus, he ended up on the streets looking for what was clearly missing at home.

    **F.   The Sentencing Guidelines are Advisory and Under All the Circumstances, the Just and Reasonable Sentence is Substantially Below the Sentencing Guidelines Range.**

Pursuant to specific statutory direction, the federal court must impose sentences which are sufficient "but not greater than necessary" to achieve the federal statutory sentencing purposes of just punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a). And while the sentencing guideline range in this matter is 151 - 188 months, *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), makes clear that the history and characteristics of the defendant as well as the offense and the guideline range should all be carefully considered by the sentencing judge:

> Prior to *Booker/Fanfan*, the section 3553(a) requirement that the sentencing judge 'consider' all of the factors enumerated in that section had uncertain import because subsection 3553(b)(1) required judges to select a sentence within the applicable Guidelines range unless the statutory standard for a departure was met. Now with the mandatory duty to apply the Guidelines excised, the duty imposed

by section 3553(a) to 'consider' numerous factors acquires renewed significance. *Crosby,* 397 F.3d at 111.

Pursuant to *Booker/Fanfan*, the sentencing judge now has a duty to determine the sentencing guideline range, and to "'consider' it along with all of the factors listed in section 3553(a)." *Crosby,* 397 F.3d at 112.

In this regard, it is respectfully submitted that the defendant's young age, absence of prior convictions or prior sentences to prison;  harsh confinement conditions; and the possibility for disparity in sentence with co-defendants that will exist if he receives the sentence sought by the government, strongly support a prison sentence of no greater than 132 months.  Indeed, it is further respectfully submitted that a longer term would be greater than necessary to achieve the goals of federal sentencing.

Thank you very much for your attention.

Sincerely,

*Robert A. Soloway*

Robert A. Soloway

cc: AUSA Jamie Bagliebter
    (by ECF)
RAS:sc